```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLORADO
 3   MICHAEL BOATMAN, an individual,         )
 4                      Plaintiff,           )
 5          -vs-                             )Civil Action
 6   UNITED STATES RACQUETBALL ASSOCIATION,  )
 7   d/b/a USA RACQUETBALL, a Colorado       )
 8   Corporation,                            )
 9                      Defendant.           )
10
11        The deposition of DENIS M. BOATMAN, called as
12   a witness for examination, taken pursuant to the
13   Federal Rules of Civil Procedure of the United
14   States District Courts pertaining to the taking of
15   depositions, taken before KIMBERLY A. MURPHY, a
16   Notary Public within and for the County of DuPage,
17   State of Illinois, and a Certified Shorthand
18   Reporter, CSR No. 84-2586, of said state, at Suite
19   3800, 55 West Monroe Street, Chicago, Illinois, on
20   the 30th day of January, A.D. 2013, at 9:30 a.m.
21
22
23        Job #10964
24
```

Page 154

1 those tournaments while Mr. Negrete was the
2 commissioner?
3     A.   **Full compensation, travel and hotel**
4 **accommodations and food, plus a thousand dollars.**
5 **Again, the IRT doesn't have a ton of money.**
6     Q.   Again, the testimony is that then you
7 would have provided a CD of images to Mr. Negrete
8 following the event?
9     A.   **That's correct.  And they could -- they**
10 **could use those images to promote the IRT and any**
11 **editorial usage.**
12    Q.   That was the handshake agreement?
13    A.   **Correct.**
14         (WHEREUPON, said document was marked
15         Boatman Deposition Exhibit No. 64, for
16         identification, as of 01/30/2013.)
17         (WHEREUPON, the document was tendered to
18         the witness.)
19 BY MR. KUZNIAR:
20    Q.   Showing you what's been marked
21 Exhibit 64, it looks like an agreement between you
22 and Shannon Wright with the USRF dated on or about
23 November 30, 2010; is that right?
24    A.   **Yes.**

Page 155

1     Q.   Previously I asked questions about an
2 invoice and USRF's use of, I think, five
3 photographs.  Is this Exhibit 64 in relation to the
4 $2,000 that the USRF had paid to you?
5     A.   **I believe so.**
6     Q.   Tell me what the circumstances were that
7 gave rise to this agreement.
8     A.   **During the 2010 US Open at the banquet**
9 **on Saturday night Dr. Wright was introducing the**
10 **foundation to the racquetball community at their**
11 **banquet, and she had a PowerPoint show with that**
12 **presentation of the foundation, and my images were**
13 **part of her PowerPoint program.**
14    Q.   That was the one and then the four
15 images on the USRF website?
16    A.   **Correct.**
17    Q.   It says, "The images may be used for
18 print, PowerPoint, internet, marketing, editorial,
19 advertising and broadcast directly in connection
20 with the USRF."  Do you see that?
21    A.   **Uh-huh.**
22    Q.   You have to say yes or no.
23    A.   **I'm sorry.  Yes.**
24    Q.   Then it has the "may nots" about gifting

Page 156

1 or selling to third parties without your prior
2 consent?
3     A.   **Yes.**
4     Q.   Was there -- you may have testified to
5 this already.
6          Was there any other agreement with USRF
7 besides this that you negotiated either with
8 Mr. Stafford or Ms. Wright?
9     A.   **I don't recall.**
10    Q.   But after this, this is where you would
11 have donated photos to USRF?
12    A.   **Correct.**
13    Q.   Do you have a similar agreement like
14 this that would support any of the donated photos?
15    A.   **I believe so.**
16    Q.   If there is, it would be in the
17 production?
18    A.   **Yes.**
19    Q.   And although it doesn't make reference
20 to the compensation, it is your testimony that the
21 $2,000 that you invoiced to them and they paid to
22 you supported this license?
23    A.   **Yes.**
24         MR. ANDERSEN:  I believe you also have a copy

Page 157

1 of that agreement as documents produced by USRF
2 pursuant to your subpoena to them.
3         MR. KUZNIAR:  Okay.
4         (WHEREUPON, said document was marked
5         Boatman Deposition Exhibit No. 65, for
6         identification, as of 01/30/2013.)
7         (WHEREUPON, the document was tendered to
8         the witness.)
9 BY MR. KUZNIAR:
10    Q.   Mr. Boatman, you have Exhibit 65 which
11 apparently is an agreement between you and the WPRO,
12 the Women's Professional Racquetball Organization.
13 It's not signed, but there is an open date of
14 September of 2010.  Do you see that?
15    A.   **Yes.**
16    Q.   Although not signed and no date on the
17 first page, is this an agreement that existed that
18 was actually executed?
19    A.   **I don't believe it was executed, no.**
20    Q.   Who prepared this agreement?
21    A.   **I don't recall.**
22    Q.   When you are dealing with -- in your
23 dealings with tours like the IRT, the WPRO, was it
24 normal for them to have prepared any agreement or is

MICHAEL BOATMAN -vs- UNITED STATES RACQUETBALL ASSOCIATION
Denis Boatman
Job 10964
Pages 174..177

Page 174

1  to reduce these agreements -- these handshake
2  agreements to writing?
3     A.   The US Open handshake agreement was
4  reduced to writing in 2009 at the request of Doug
5  Ganim.
6     Q.   Why was that?
7     A.   I don't know why he asked me to put it
8  in writing.
9     Q.   You are not aware of anything going on
10 in 2009 that would have caused him to say we need to
11 put this in writing?
12    A.   No.
13    Q.   Again, we will find it, but that's just
14 the e-mail exchange between you and Doug. I think
15 you say, "Here is our agreement that we have had for
16 the last 14 years," and you just kind of put in
17 black and white what your agreement is, and he
18 responds "yes"?
19    A.   Correct.
20    Q.   And with respect to USRA, what was the
21 reasoning for the US Open agreement and then the
22 stock license agreement?
23    A.   It came to my attention that Mr. Hiser
24 had distributed my images to the USRF which would be

Page 175

1  outside of my -- any agreement I have with anybody,
2  and Mr. Ganim through a phone conversation said he
3  needed a new agreement to govern the 2010 US Open,
4  and that agreement was never enacted or never put
5  together. It was enacted. Eventually it was put on
6  paper, and Heather Fender was needing images for
7  editorial use to represent the US Open, and I had
8  nothing in writing to protect myself or the images
9  because Mr. Ganim had killed the agreement that we
10 had in place that allowed for only editorial usage
11 outside of promoting the US Open, and I had no
12 agreement with the USRA.
13    Q.   So the reasoning behind was -- on your
14 end you decided if Doug Ganim is now disallowing me
15 to proceed, I need to get a separate agreement with
16 USRA?
17         MR. ANDERSEN:  Object to form.
18 BY THE WITNESS:
19    A.   I'm not sure I agree with him
20 disallowing me to proceed.
21 BY MR. KUZNIAR:
22    Q.   Maybe bad word choice, but your
23 testimony is that Doug Ganim -- Doug Ganim told you
24 what that would have affected your ability to

Page 176

1  photograph for the 2010 US Open?
2       MR. ANDERSEN:  Object to form.
3  BY THE WITNESS:
4     A.   Doug Ganim told me that he needed a new
5  agreement to govern the 2010 US Open giving him the
6  right to distribute to third parties at his
7  discretion which I'm not in agreement with, and this
8  came up after I had sent Mr. Hiser an e-mail asking
9  him why he had sent -- why he had distributed my
10 images to third parties.
11         In the course of the conversation on the
12 phone with Mr. Ganim he never brought up
13 Mr. Hiser's actions or the distribution to the USRF,
14 so I knew that he was communicating with me in a
15 disingenuous manner.
16 BY MR. KUZNIAR:
17    Q.   Mr. Ganim?
18    A.   Mr. Ganim by asking for the right to
19 distribute images to third parties at his
20 discretion.
21    Q.   Okay.
22    A.   But in the course of that conversation
23 he stated he needed a new agreement for 2010, that
24 the old agreement wouldn't work.

Page 177

1     Q.   So your objection to his proposal of his
2  ability to distribute to third parties was the
3  issue, is that right, for not putting the other new
4  agreement?
5     A.   That would have been one of the issues.
6     Q.   What were others?
7     A.   The fact that he was lying to me on the
8  telephone, that he was being disingenuous would be
9  another issue.
10    Q.   Did you ask him at all about the USRA
11 use of the photos?
12    A.   No, I didn't. I didn't feel like I
13 needed to -- Doug Ganim is a very aggressive,
14 explosive, argumentative individual. He didn't
15 distribute my images. Mr. Hiser did. So I really
16 didn't feel like I needed to fight with Doug Ganim
17 over something Mr. Hiser did.
18    Q.   Is is your testimony that you provided
19 US Open images to both USRA and Doug Ganim?
20    A.   No.
21    Q.   Who did you -- I thought you said you
22 had -- in the past you would have provided those
23 images to USRA. Is that true?
24    A.   You are using the term "images." I'm

Page 194

1  Q.  Sir, you are looking at Exhibit 67 which
2 for the record is Boatman 393 and 394 which is a
3 stock photography license with terms and conditions
4 between Jim Hiser on behalf of USRA and you; is that
5 right?
6  **A.  Yes.**
7  Q.  We looked at a similar stock photography
8 licensing agreement earlier in the exhibits?
9  **A.  Yes.**
10  Q.  I think your testimony was that that
11 document, the previous exhibit, was based on a
12 template you had purchased from Photo Attorney; is
13 that correct?
14  **A.  Yes.**
15  Q.  Is that also true for Exhibit 67?
16  **A.  Yes.**
17  Q.  As you look at Exhibit 67, are you aware
18 of any changes that you would have made to the
19 document template that you purchased from Photo
20 Attorney?
21  **A.  Not that I recall.**
22  Q.  So walk me through the first part here.
23 It says "Photographer: Mike Boatman," correct?
24  **A.  Yes.**

Page 195

1  Q.  "Client: USA Racquetball"?
2  **A.  Yes.**
3  Q.  "Images: Action photos of racquetball
4 from 2003 to 2009"?
5   MR. ANDERSEN:  I object to this line of
6 questioning as the document speaks for itself.
7 BY THE WITNESS:
8  **A.  Yes.**
9 BY MR. KUZNIAR:
10  Q.  "Licensed use: Unlimited print and
11 electronic/web editorial use for USAR."  Is that
12 right?
13  **A.  Yes.**
14  Q.  "Licensed territory: 'Worldwide'"?
15  **A.  Yes.**
16  Q.  "License time: Three years starting
17 January 6, 2011"?
18  **A.  Yes.**
19  Q.  Then "License fee: $1,000 paid in
20 consecutive quarters of $250 first payment required
21 in advance balance due before 12/1/2011."  Do you
22 see that?
23  **A.  Yes.**
24  Q.  Are you -- this document is signed

Page 196

1 obviously by Jim Hiser.  And is that your signature
2 on Page 394?
3  **A.  Yes.**
4  Q.  Do you have a recollection of when you
5 signed this document?  It's not dated by you.
6  **A.  I don't recall.**
7  Q.  Based on e-mails when I was looking
8 through them, it appears you might have signed it
9 later than January of 2011.  Does that do anything
10 for you in terms of when it might have been signed?
11  **A.  I don't recall.**
12  Q.  Again, your testimony is that the
13 contents of the agreement -- you don't know whether
14 it's exactly the same as the template that you
15 purchased from Photo Attorney or whether you made
16 changes to that template?
17   MR. ANDERSEN:  I object to form.
18 BY MR. KUZNIAR:
19  Q.  Your answer.
20  **A.  That's correct.**
21  Q.  Continuing on, it says, "Images: All
22 visual representations furnished to client by
23 photographer."  Do you see that?
24  **A.  Yes.**

Page 197

1  Q.  Did you provide any photographs to USRA
2 pursuant to this agreement?
3  **A.  I provided some photographs pursuant to
4 this agreement that appeared in the sponsorship
5 package.**
6  Q.  Those 13 photos in the sponsorship
7 package, I think it was 13?
8  **A.  Something like that.**
9  Q.  Any additional photos provided by you to
10 USRA pursuant to this agreement?
11  **A.  Any images that I distributed to them
12 after this date would have been pursuant to this
13 agreement.**
14  Q.  But I'm asking your recollection.  Did
15 you at any point --
16  **A.  I don't recall.**
17  Q.  Other than the ones that were provided
18 for the sponsorship package, you don't recall
19 whether you provided any additional photos?
20  **A.  I'd have to look through my e-mails to
21 see.**
22  Q.  There is a provision for releases.  Do
23 you see that?
24  **A.  Where?**

Page 198

1 Q. It says, "Images, Rights, Metadata,
2 Releases." It says, "Unless otherwise specifically
3 stated, no model or property release exists for the
4 images. Client assumes sole responsibility to
5 determine whether model and/or property releases are
6 required by law and whether any releases provided by
7 the photographer are appropriate for client's use of
8 the images."
9     Do you see that?
10 A. Yes.
11 Q. Is that a term that you would ordinarily
12 put into an agreement? The reason I ask is there
13 was that earlier agreement that was talking about
14 trespass and authority to be there, and I presume
15 there was maybe an issue about taking photographs of
16 individuals and privacy issues that they might have.
17    MR. ANDERSEN: I object to the form.
18 BY THE WITNESS:
19 A. I'm sorry. I don't understand the
20 question.
21 BY MR. KUZNIAR:
22 Q. That's fine. Is this provision dealing
23 with releases, models or property something that is
24 common in the industry?

Page 199

1 A. Yes, it is common in the industry.
2 Q. It puts the burden on the client, if you
3 will, and the responsibility on the client to make
4 sure that they have whatever releases they need from
5 the model, the property and what not; is that right?
6 A. Yes.
7 Q. With respect to the license fees of
8 $1,000 paid in 250 increments, payment in full due
9 by December 1 of 2011, did you receive any payments
10 from USRA pursuant to this agreement?
11 A. I received the $250 prior to giving them
12 any images in advance as I required. They sent me a
13 second payment in September after I already sent
14 them a demand letter and after Mr. Hiser had already
15 indicated to me he wouldn't be making any more
16 payments.
17 Q. I'm confused. You received the initial
18 payment of $250?
19 A. Yes.
20 Q. When was that?
21 A. I believe it would be -- they FedExed it
22 out so I must have received it, I believe, around
23 the 7th, January 7th, 2011.
24    MR. KUZNIAR: We will mark this.

Page 200

1    (WHEREUPON, said document was marked
2    Boatman Deposition Exhibit No. 68, for
3    identification, as of 01/30/2013.)
4    (WHEREUPON, the document was tendered to
5    the witness.)
6    (WHEREUPON, a recess was had.)
7 BY MR. KUZNIAR:
8 Q. Before our break we were talking about
9 the initial $250 payment pursuant to the stock
10 photography license?
11 A. Yes.
12 Q. Before you should be Exhibit 68 which
13 may be the $250 initial invoice or the initial
14 invoice for the first $250. It's dated January 18,
15 2011.
16 A. It's not the initial invoice that was
17 created.
18 Q. Okay.
19 A. The date that it's marked as paid is
20 incorrect because I was traveling. It came in while
21 I was out of town.
22 Q. So you would have received it before
23 January 18, 2011?
24 A. Yes.

Page 201

1 Q. Looking at Exhibit 68 in the description
2 it reads, "First quarter payment for stock images,
3 no usage until full payment." Do you see that?
4 A. Yes.
5 Q. It says, "This invoice is being created
6 to clear the $250 payment in my books on 5/2/12."
7 Do you see that?
8 A. Yes.
9 Q. What does that mean?
10 A. The original invoice that I created at
11 the time of this agreement was for $1,000, and then
12 I applied the $250 against that $1,000 in my
13 QuickBooks. QuickBooks holds that amount until it's
14 cleared.
15 Q. Which amount would that be, the $250 or
16 the $750?
17 A. $750.
18 Q. So it's showing as an accounts
19 receivable?
20 A. Correct. And we were going into another
21 year or -- well, actually -- so in order to clean up
22 my QuickBooks, I created this invoice to replace the
23 thousand dollar invoice just to clear the amount out
24 of my bookkeeping.

Page 202

1  Q.  So Exhibit 68 was not prepared in
2  January of 2011?
3  **A.  That's correct.**
4  Q.  It would have been prepared probably in
5  December of 2011 when you are cleaning up your 2011
6  account -- your 2011 tax year?
7  **A.  Somewhere in there, yes.  I don't recall**
8  **the exact date when I created it, but that's what**
9  **that additional note on there was for so that I**
10  **could document that -- I guess the note says I did**
11  **it on --**
12  Q.  May 2, 2012?
13  **A.  Correct.  This invoice was a bookkeeping**
14  **clean-up document.**
15  Q.  Your testimony is that there would have
16  been a $1,000 invoice submitted to USRA?
17  **A.  No.**
18  Q.  You never invoiced them?
19  **A.  I never invoiced them.  The only**
20  **document they received for payment was this one.  I**
21  **created the invoice in my bookkeeping as a**
22  **placeholder, but I never sent them an invoice.**
23  Q.  Then the description continues, "The
24  ordinal," which I presume is "ordinary"?

Page 203

1  **A.  Yes.**
2  Q.  "The ordinary invoice was void or
3  written off in January of 2012."  Do you see that?
4  **A.  Yes.**
5  Q.  That actually dates this to be January
6  of 2012 instead of May of 2011?
7  **A.  I probably in my mind voided it, but I**
8  **didn't clean it up in my bookkeeping until I made**
9  **the note of 5/2/2012.**
10  Q.  So not to put words in your mouth, but
11  you created an invoice internally in QuickBooks for
12  $1,000 probably sometime in January of 2011.  You
13  get a payment of $250 sometime before January 18,
14  2011, correct?
15  **A.  I'm sorry.  Please again.**
16  Q.  Sure.  You created an invoice in
17  QuickBooks for your own purposes for $1,000 sometime
18  in January of 2011, correct?
19  **A.  Yes.**
20  Q.  You received payment of the initial $250
21  installment before January 18, 2011?
22  **A.  Correct.**
23  Q.  At some point you voided or otherwise
24  got rid of the $1,000 invoice, and in its place you

Page 204

1  put this for $250 with the comments about why you
2  did it, kind of an adjusting in your bookkeeping
3  here.  Is that fair?
4  **A.  Correct.**
5  Q.  Now, from a timing perspective you had
6  said that you had provided photographs for the
7  sponsorship package in January.  Maybe you didn't
8  say January, but you provided the photographs that
9  were used in the sponsorship package.  Do you
10  remember who you provided those to?
11  **A.  Mary Meredith.**
12  Q.  Do you recall when that was?
13  **A.  There is an e-mail documentation to when**
14  **it was.  It was mid-January.**
15  Q.  And you approved the final form or you
16  at least got a copy.  You approved a final form or a
17  copy of the sponsorship package that had used your
18  photographs, right?
19  **A.  No.  I wasn't given an opportunity to**
20  **approve it.**
21  Q.  You ratified it after the fact.  I think
22  your comment was, "It looks great," something to
23  that fact?
24  **A.  I saw it after the fact, yes.**

Page 205

1  Q.  And you had no issue with it at that
2  time?
3  **A.  No.  We were within the first quarter.**
4  Q.  Well, what does that have to do anything
5  with the first quarter?
6  **A.  Well, they had paid for the first**
7  **quarter usage so I had no reason to believe they**
8  **wouldn't pay the balance of the contract.**
9  Q.  So that's how you interpreted the
10  agreement, Exhibit 67?
11  **A.  I'm sorry?**
12  Q.  Well, you provided photographs.  You
13  allowed their use in the sponsorship package,
14  correct?
15  **A.  Pursuant to being paid in full.  I had**
16  **several conversations with Eddie Meredith where I**
17  **very clearly explained to him that I have to be paid**
18  **in full on this contract, that I have a previous**
19  **experience with USRA where they commissioned me to**
20  **do work and then reneged on it.**
21  Q.  But that wasn't really my question.
22  You had approved in the first quarter of
23  2011 the sponsorship package, right?
24  **A.  Conditional upon being paid in full.**

MICHAEL BOATMAN -vs- UNITED STATES RACQUETBALL ASSOCIATION  
Denis Boatman  
Job 10964  
Pages 206..209

Page 206

1  Q.  That's your testimony, that you told
2  Eddie Meredith it was conditional upon being paid in
3  full, the full $1,000?
4  **A.  Yes.**
5  Q.  When was that conversation with
6  Mr. Meredith?
7  **A.  It was prior to receiving the $250**
8  **check.**
9  Q.  So that's somewhere between -- this is
10  signed January 7.  You think you got the check
11  before this was returned and signed by Jim Hiser?
12  **A.  I think I got the check on the 7th.**
13  Q.  And is there any e-mail communications
14  between you and Mr. Meredith that would confirm your
15  instruction to him that it's basically a conditional
16  approval?
17  **A.  It's conditional approval upon full**
18  **payment.  There are e-mails to when Eddie was asking**
19  **for images.  In those e-mails it does say that I**
20  **won't send you any images prior to being paid, but**
21  **the conditional portion of it was in a telephone**
22  **call which is why I was explaining that I don't**
23  **trust you guys.  You need to send me $250.  This is**
24  **why I don't trust you, and I had to be paid in full,**

Page 207

1  and if, Eddie, you are giving me your word I'm going
2  to get paid, then I will extend these images based
3  on your word I'm going to be paid.
4  Q.  So regardless of what the terms are of
5  Exhibit 67, that was your conversation with Eddie?
6  **A.  Yes.**
7  Q.  Besides this issue about payment and the
8  remaining balance due in 2011, do you have any issue
9  whatsoever with the sponsorship package?
10  **A.  No.  I --**
11  Q.  I'm not suggesting you had to --
12  **A.  No.  I told Eddie I will provide you**
13  **images for the sponsorship package provided I get**
14  **paid.**
15  Q.  Understood.  But the sponsorship package
16  itself, you have no objection to?  It's the fact
17  that you didn't get paid the remaining $750; is that
18  right?
19  **A.  That would -- I don't have any problems**
20  **with the sponsorship package.**
21  Q.  You had testified moments ago that there
22  was a second payment that had been tendered to you
23  for $500?
24  **A.  Yes.**

Page 208

1  Q.  Do you recall when about you would have
2  received that second payment?
3  **A.  I believe it was sometime in September.**
4  Q.  And you did not deposit?
5  **A.  No, I did not.**
6  Q.  Why not?
7  **A.  Because I had already sent a demand**
8  **letter for the fact that they had been using my**
9  **images without -- and didn't pay me, and Mr. Hiser**
10  **had given me an e-mail stating that he wouldn't be**
11  **paying me anymore.  So I took Mr. Hiser at his word**
12  **that he said -- I think it was in April -- that he**
13  **wouldn't be paying me anymore.  I waited until the**
14  **end of the quarter to make certain that he, indeed,**
15  **wasn't going to pay me, that he was going to be true**
16  **to his word, and the quarter came and passed.**
17  **He told me he is not going to pay me.**
18  **The entire quarter passed.  He didn't have a change**
19  **of heart.  I wasn't paid.  So I hired the Photo**
20  **Attorney and sent a demand letter.**
21  Q.  When did you hire the Photo Attorney on
22  this matter?
23  **A.  I don't recall the exact date.**
24  Q.  I think the date of the letter is

Page 209

1  sometime in September of '11, the demand letter that
2  you referenced, so sometime before then, but after
3  it sounds like the second quarter of 2011?
4  MR. ANDERSEN:  I object to the form.
5  BY THE WITNESS:
6  **A.  I really don't recall the exact date.**
7  BY MR. KUZNIAR:
8  Q.  Had you consulted with Mr. Andersen --
9  again, not substantive communications.  But had you
10  consulted with Mr. Andersen or Ms. Wright or any
11  other attorneys with Photo Attorney about this
12  situation with USRA prior to 2011?  It's not a trick
13  question.  That might have been November of 2010 you
14  said they might have prepared that --
15  MR. ANDERSEN:  I will object to the
16  attorney-client privilege that if there were
17  conversations beforehand that they would have
18  involved that matter.
19  MR. KUZNIAR:  He can -- that's not divulging
20  privilege.
21  BY MR. KUZNIAR:
22  Q.  Had you consulted with Mr. Andersen,
23  Ms. Wright or anybody else affiliated with the Photo
24  Attorney on these matters that are at issue in this